AO 91 (Rev. 02/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
District of Arizona

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Jorge Esquivel-Vela | ) | Case No. 17-7561 MJ |
| *Defendant* | ) | |
| | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about August 2, 2017, through on or about November 6, 2017, in the District of Arizona, Jorge ESQUIVEL-Vela, fraudulently and knowingly attempted to export and send from the United States any merchandise, article, or object contrary to any law or regulation of the United States, and received, concealed, bought, sold, and in any manner facilitated the transportation, concealment, and sale of such merchandise, article or object, to wit: 100,000 M42C1 Primers for exportation to Mexico, knowing the same to be intended for exportation contrary to any law or regulation of the United States, to wit: Arms Export Control Act Title 22, United States Code, Section 2778; Title 22, Code of Federal Regulations, Part 121.1 and 22, Code of Federal Regulations, Part 123.1.

In violation of Title 18, United States Code, Section 554.

This criminal complaint is based on these facts:

**See Attached Affidavit in Support of Criminal Complaint Incorporated By Reference Herein**

REVIEWED BY:  AUSA Lisa E. Jennis

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Scott B. Wagoner, Special Agent,
Homeland Security Investigations
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  ___11/7/17___

_____
*Judge's signature*

Honorable Bridget S. Bade
United States Magistrate Judge
*Printed name and title*

City and state:  ___Phoenix, Arizona___

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Scott B. Wagoner, being duly sworn, hereby depose and state as follows:

1. I am a Special Agent with U.S. Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI) currently serving in the Phoenix Field Office, and have been so employed for approximately eight years.  Prior to being a Special Agent with HSI, your affiant was a Border Patrol Agent in Casa Grande, Arizona.   Your Affiant is currently assigned to the Counter-Proliferation Investigations (CPI) group, which conducts investigations involving the illegal export of military and defense articles and "dual use" items (used in both civil and military functions) from the United States.

2. Your affiant is also familiar with 18 U.S.C. § 554, which makes it illegal to fraudulently and knowingly export or send from the United States, or attempt to export or send from the United States, any merchandise, article, or object contrary to any law or regulation of the United States, and/or to receive, conceal, buy, sell, or in any manner facilitates the transportation, concealment or sale of such merchandise, article or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States. Further, 22 U.S.C. Section 2778 and 22 C.F.R. parts 121.1 and 123.1 make it unlawful to export U.S Munitions List items, to include firearms parts, firearms, and ammunition from the United States without a license issued by the U.S. Department of State.

## THE ARMS EXPORT CONTROL ACT ("AECA")

3. In furtherance of the security and foreign policy interests of the United States, the United States regulates and restricts the export of arms, munitions, implements of war, and defense articles, pursuant to the Arms Export Control Act ("AECA"), Title 22, United States Code, Section 2778.   The regulations that govern such exports are entitled the International Traffic in Arms Regulations ("ITAR"), Title

22, Code of Federal Regulations, Parts 120-130.

4.  The ITAR implements the provisions of the AECA, and establishes the framework for regulating the export of defense articles. The ITAR defines an "export" as the sending or taking of a defense article out of the United States in any manner. The ITAR contains the United States Munitions List ("USML"), Title 22, Code of Federal Regulations, Section 121.1. Items and services listed in the USML are deemed "defense articles" and "defense services," and are subject to control by the ITAR.

5.  The USML sets forth 21 categories of defense articles and services that are subject to export licensing controls. Included in this list are such things as military aircraft, helicopters, artillery, shells, missiles, rockets, bombs, vessels of war, explosives, military and space electronics, certain types of optical equipment, guns, ammunition, firearms, close assault weapons, combat shotguns, and components of such firearms and weapons.

6.  No defense articles or defense service may be exported or otherwise transferred from the United States to a foreign country without a license or written approval from the United States Department of State, Directorate of Defense Trade Controls ("DDTC"). The ITAR also prohibits re-exports, transfers, transshipments, and diversions from foreign countries of previously exported defense articles or services without State Department authorization.

7.  As certified by the DDTC, the 100,000 M42C1 Primers are defense articles covered by the United States Munitions List, Title 22, Code of Federal Regulations, Section 121.1, Category III(a) and Category I(g)6 of the U.S. Munitions List (USML).

## FACTS

8.  Based upon my personal observations, consultation with other agents and law enforcement officers, I have learned the following facts:

9. On or about August 2, 2017, through on or about November 7, 2017, Homeland Security Investigations (HSI) Phoenix, AZ Special Agents (SAs) received information regarding a suspicious inquiry by AMC Military Provisions LLC (hereinafter "AMC") a company believed to be located in San Antonio, Texas and Mexico City, Mexico. An AMC representative requested a quote via email for 100,000 M42C1-G Primers, 29,600,000 cartridges (5.56mm x 45mm), and five tons double base gunpowder VI 1230 ft/s – 375m/s. According to AMC, the items were going to Mexico. An undercover agent (UCA) was subsequently introduced as a Vice President of Sales of a company that could possibly obtain the requested items and gave a quote for the items requested. It was later determined that JORGE ESQUIVEL-VELA (hereinafter "ESQUIVEL") was the CEO of AMC.

10. On August 9, 2017, HSI SA Wagoner spoke with Alcohol Tobacco and Firearms (ATF) Industry Operations Investigator (IOI) Robert Turner regarding AMC and ESQUIVEL. According to IOI Turner, ESQUIVEL possessed a Type 1 Federal Firearms License (FFL), however the FFL was currently not in good standing with ATF. ESQUIVEL first applied for a Type 8 FFL from ATF in November 2016, which allows the FFL to import and deal in firearms and ammunition. ESQUIVEL later withdrew his application due to the cost associated with a Type 8 license and got a Type 1 license instead which only allows him to deal firearms other than destructive devices and ammunition (no black powder). ATF approved his Type 1 license in January 2017. ESQUIVEL explained to ATF that he would be utilizing a free trade zone in South Texas to move firearms and ammunition

3

through the country and on to places like Mexico and Columbia (known as "drop shipments") to avoid the importation requirement. This license was later revoked on or about August 18, 2017, because ESQUIVEL's FFL was evicted from his brick and mortar store in San Antonio, TX.

11. On August 17, 2017, the UCA received an email from Michael Ortiz (hereinafter "Ortiz"), AMC's purchasing agent in Houston, TX, accepting the UCA's quote and stating that ESQUIVEL wants to visit as soon as possible to complete the deal. Ortiz followed up with a phone call within the hour agreeing to the quote sent by the UCA on August 3, 2017. According to Ortiz, the end user for the requested items was the Mexican Military. Ortiz further stated that AMC was in possession of all the necessary U.S. permits and Mexican acceptance documents and would have AMC's corporate office send over all the paperwork to the UCA.

12. Subsequently on August 17, 2017, the UCA spoke to ESQUIVEL on the telephone. ESQUIVEL spoke Spanish and HSI SA Chad Ostergaard translated the conversation for the UCA. During the call, ESQUIVEL stated that he needed the primers and the gunpowder before August 29, 2017, but not the cartridges. The UCA told ESQUIVEL that he could not obtain a license from the State Department in that timeframe and needed at least thirty days to get one. ESQUIVEL replied that he hoped the UCA could make it happen with the documents and the money that he would provide. ESQUIVEL understood that the UCA would not be able to obtain a license in such short notice but still indicated that he wanted to move forward with the deal. Ortiz followed up ESQUIVEL's

4

phone conversation with an email that same day asking the UCA to confirm if he had received the information the UCA requested. Ortiz claimed he instructed his corporate office to send the information immediately. Ortiz claimed that he and ESQUIVEL would be visiting the UCA in Phoenix soon and wiring money for the requested items.

13. Checks of Department of Homeland Security (DHS) databases showed no prior exports for AMC Military Provisions, Jorge ESQUIVEL, or Michael Ortiz. Additional database checks revealed that none of these subjects including AMC are registered with the State Department as a manufacturer, exporter, or broker. These checks also showed that AMC, ESQUIVEL, and Ortiz have not previously applied for any State Department Export License.

14. On August 22, 2017, Ortiz contacted the UCA by telephone to postpone ESQUIVEL's and his trip to Phoenix. The UCA reiterated that AMC has to apply for the Department of State (hereinafter "DOS") license and that there were other forms they needed to fill out prior to sending the order to Mexico and that the license and other paperwork take some time. The UCA also told Ortiz that ESQUIVEL previously told him that the U.S. permits and licenses were already completed but that the UCA has yet to see them. The UCA reiterated to Ortiz that a DOS license is necessary to export the items out of United States.

15. On August 29, 2017, the UCA called Ortiz and asked if he talked about everything with ESQUIVEL and if they are still interested in coming to Phoenix. The UCA also asked if they understood DOS licensing requirements. Ortiz stated that they

5

already had the export licenses from the ATF and will be coming to Phoenix. The UCA reminded him that they need the export license from the Department of State to export the items.

16. Later in the day on August 29, 2017, Ortiz and ESQUIVEL called UCA and told him they planned to travel to Phoenix the following Monday or Tuesday. ESQUIVEL and Ortiz said that they needed the gunpowder by October 20, 2017 and needed the primers immediately. The UCA again told ESQUIVEL and Ortiz that they needed a DOS license for the export of the primers and powder and it took between 30 and 90 days to get the license. ESQUIVEL wanted to know if there was any way the UCA could help him get the license faster and discussed expediting the process. The UCA asked if either Ortiz or ESQUIVEL were registered with DOS and ESQUIVEL replied that AMC is registered with DOS. The UCA stated that he would apply for the license and asked ESQUIVEL for his K number (DOS # for broker or exporter) for the license application. The UCA clarified that the DOS license is different from ATF licenses and the DOS license is what allows exports. ESQUIVEL stated that he would email UCA the DOS and ATF numbers later, however he never did. Ortiz told the UCA that he is not personally registered and that that the export would be done through AMC not him. ESQUIVEL inquired if the powder and primers are in U.S. or overseas and UCA told him that they are in the U.S. The UCA stated he would send the DOS forms to both of them to fill out for the DOS license application.

6

17. That same day, August 29, 2017, the UCA sent an email to Ortiz and ESQUIVEL, with the DSP-83 (nontransfer and use certificate) and DSP-5 (application for permanent export of unclassified defense articles, related technical data and defense services), both of which are required for the application of the U.S. Department of State export license.  The UCA also sent internet links for the instructions for both forms.

18. On Sept 11, 2017, the UCA called ESQUIVEL who stated he wanted the UCA to help him with the paperwork.  The UCA again reminded ESQUIVEL that they needed at least 30 days to register with DOS and another 30 days to get a DOS license. ESQUIVEL asked the UCA if there was any way for him to pay the UCA extra money to expedite the process to which the UCA responded that anything could be negotiated for a price.  The UCA asked ESQUIVEL, what he meant when he said expediting and ESQUIVEL replied that he wants to sit down and talk about expediting the primers and the gunpowder.  The UCA again asked ESQUIVEL what he means by expediting and told ESQUIVEL that the U.S. licensing is what slows the process down.  ESQUIVEL said that he is not worried about the U.S. license and that he already has the Mexican paperwork.  The UCA told ESQUIVEL that the UCA's company is the one taking the risk and the items that AMC wanted require a license to export.

19. On September 13, 2017, ESQUIVEL and Ortiz arrived in Phoenix and met with the UCA to further discuss the exportation of the primers and gunpowder.  During the meet, the UCA again provided the DSP-5 and DSP-83 State Department forms

7

to ESQUIVEL and Ortiz and explained the State Department license process. ESQUIVEL stated that he would get the forms signed later this week but then asked the UCA if he could do anything to make it happen by October 2017 since they needed to have the powder and primers by October.

20. On September 13, 2017, the UCA told ESQUIVEL and Ortiz that there were two roads to get the items exported to Mexico. The first road was the legal way by obtaining a license. The second road was the illegal way without obtaining a license. ESQUIVEL and Ortiz said they wanted to expedite the order by doing it the illegal way. Ortiz said that it was a "necessary evil" but it needed to be done. During the meeting, ESQUIVEL and Ortiz told the UCA that the items just needed to be delivered to a broker in Laredo, Texas who will facilitate getting the items into Mexico.

21. On September 13, 2017, the parties also discussed the price of the powder and the primers. ESQUIVEL thought the price for the powder was too high but agreed to the price of the primers--which was $2,500 for the 100,000 primers. ESQUIVEL said he would talk with the General in Mexico about the prices and get back with them tomorrow.

22. The evening of September 13, 2017, there was a series of text messages between the UCA, Ortiz and ESQUIVEL discussing the sale of the primers. Ortiz called the UCA and said that he had just spoken with ESQUIVEL and that ESQUIVEL said that the primers "are a go, a done deal". The UCA made sure that Ortiz knew that

they still needed a license for the primers and there was an additional fee for doing
it without the license and they can settle the deal tomorrow.

23.    On September 14, 2017, the UCA met with Ortiz and ESQUIVEL to discuss the
illegal sale of 100,000 M42C1 primers. The UCA asked ESQUIVEL, if he
wanted the primers with or without the DOS license. ESQUIVEL replied that they
needed the primers by the end of the month and wanted to know what the UCA
can do without the license. The UCA told ESQUIVEL that he was taking a risk
smuggling the primers and quoted ESQUIVEL $5,000, which included a 50%
smuggling fee to get the primers to the broker in Laredo for subsequent export to
Mexico. ESQUIVEL told the UCA that for $4,000, he would sign the contract
now and the send the money via bank wire transfer tomorrow (9/15/17). The
UCA agreed to the deal.

24.    The UCA, once again, made sure that both ESQUIVEL and Ortiz were aware that
this deal was illegal and that the primers were export controlled and required a
license to export. ESQUIVEL said that they would apply for the license next year
for the future deals but did not want the license on this deal because the primers
need to be in Laredo by October 25, 2017.

25.    The UCA showed Ortiz and ESQUIVEL the contract that included the ITAR
warning in both English and Spanish. ESQUIVEL and Ortiz expressed that both
understood what they were doing was illegal. ESQUIVEL said he has an import
license in Mexico and knows that it was not legal here in the U.S. The UCA told
ESQUIVEL and Ortiz that all parties involved in brokering this deal by law have

to be registered with the State Department as a broker, which both ESQUIVEL and Ortiz understood.   ESQUIVEL signed and initialed the contract for the primers.  Ortiz did not want his name on the contract and did not sign it.

26.   On September 15, 2017, Jorge ESQUIVEL, wired $4,000 in illegal proceeds to a government controlled bank account for the illegal export of the primers.   The wire came from AMC Military Provisions LLC.  ESQUIVEL emailed the UCA a photo of the wire transfer receipt and Ortiz called the UCA to see if the UCA received the receipt and let him know that ESQUIVEL deposited the money.

27.   On October 12, 2017, the Department of State Directorate of Defense Trade Controls issued a findings letter, stating that primers are controlled and listed under the USML as Category IIIa.

28.   On October 12, 2017, the Department of State Directorate of Defense Trade Controls issued a License and Registration History Check detailing that neither AMC, ESQUIVEL nor Ortiz have any record of a registration application, any application for an export license, any export license granted to, or any other written approval granted to an individual or entity so identified with respect to the exportation of defense articles or defense services, brokering, or any other regulated activities regarding the temporary import, export, or transfer of any defense articles or defense services.

29.   For these reasons, this Affiant submits that there is probable cause to believe that ESQUIVEL, violated 18 U.S.C. § 554 by fraudulently and knowingly attempting to export or send from the United States, any merchandise, article, or object

contrary to any law or regulation of the United States, and/or receive, conceal, buy, sell, or in any manner facilitate the transportation, concealment or sale of such merchandise, article or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States. In addition, ESQUIVEL also violated 22 U.S.C. Section 2778 and 22 C.F.R. parts 121.1 and 123.1 making it unlawful to export primers from the United States without a license from the U.S. Department of State.

Scott B. Wagoner, Special Agent
Homeland Security Investigations

Sworn to and subscribed before me on this _____ day of November, 2017.

Honorable Bridget S. Bade
United States Magistrate Judge

11